IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


CHRISTOPHER M. TROTTER,

         Petitioner,

                             CIVIL ACTION
    vs.                          No. 09-3076-WEB

DAVID McKUNE, et al.,


         Respondents.



MEMORANDUM AND ORDER


    This matter is a petition for habeas corpus filed pursuant to 28 U.S.C. § 2254. Petitioner, a prisoner in state custody, proceeds pro se.

    The court has examined the record and enters the following findings and order.

**Background**

    Petitioner was convicted in the District Court of Wyandotte County, Kansas, of one count of premeditated murder in the first degree, one count of capital murder, one count of aggravated robbery, and one count of conspiracy to commit aggravated robbery. The jury could not reach a unanimous verdict on the death penalty, and petitioner was sentenced to concurrent

sentences of life for each murder without eligibility for parole for 50 years, 79 months for the conviction of aggravated robbery, and 32 months for the conviction of conspiracy.

The Kansas Supreme Court summarized the facts of this matter as follows:

> Just before daybreak on May 21, 2001, Christopher Trotter (Trotter), Virdal Nash, Kevin Eddington, and Michael Navarre were crouched in the woods behind the duplex of James Darnell Wallace and his wife Traylennea Huff in Kansas City, Kansas. Dressed in dark colors to avoid detection, the four were waiting for an opportunity to enter the duplex and rob the occupants of an expected $100,000. A fifth accomplice, James Trotter (James), was parked nearby in a gold Saturn owned by Trotter's girlfriend. James was to be positioned down the road as a lookout, watching for police. James was in contact with Trotter via two-way radios.
>
> Led by Trotter, the five had spent the previous day devising a plan for the robbery. According to the plan, Nash and Navarre were to enter into the half of the duplex that they believed to be occupied by Wallace's mother and prevent her from calling the police. Trotter and Eddington were to enter Wallace and Huff's side of the duplex, yell, "ATF," bind the victims with zip-ties, take the money, and leave.
>
> Because Trotter and Nash knew Wallace and Huff, the four intruders planned to wear something that covered their faces. Trotter, Nash, and Eddington had t-shirts to tie around their heads. Navarre had a *Scream* mask to cover his face. Each wore gloves to avoid leaving fingerprints. As a show of force, Trotter was armed with Nash's .38 caliber, semi-automatic pistol, and Navarre had Trotter's nonfunctioning assault rifle.
>
> When the four first arrived at the duplex, Trotter and Eddington checked the doors to see if they could break in. After they discovered that they could not break in

through the doors, Trotter pulled out the phone line, and then the two returned to the woods to wait with Nash and Navarre. Before there was an opportunity for the four to enter the duplexes, Nash received a call from his wife asking him to bring her car home so she could go to work. While the others remained outside the duplex waiting for their opportunity to get in, Nash left to take the car to his wife.

Just as it was becoming daylight, but before Nash had returned, Wallace opened the garage door to take his dog out. Trotter ran toward the house followed by Eddington and Navarre. Trotter ordered Wallace to freeze. When Wallace began wrestling with Trotter over the gun, Eddington and Navarre ran past them into the garage and up the stairs into the house. At one point, Eddington looked back, observed Wallace remove the t-shirt from Trotter's face, and heard Wallace say to Trotter, "[C]ome on, Chris, you ain't got to do it."

Eddington and Navarre encountered Huff on the stairs. Huff screamed "I'm pregnant, don't hurt me." Eddington bound Huff's hands with a zip-tie, then Navarre asked her where the money was hidden. Huff stated that the money was in her bedroom under the bed. Eddington and Navarre then proceeded into the bedroom. Navarre looked under the bed for the money. Huff returned to the bed and laid down next to her 2 year-old daughter Janae, who had been sleeping in the bed with her mother.

While Navarre was searching for the money, he heard a gunshot. Navarre quickly located the money under the bed and gave it to Eddington. When a second gunshot sounded, Eddington and Navarre ran from the room, down the stairs, out of the garage, and headed back through the woods to where Nash had previously parked the car.

As he was going down the stairs, Navarre passed Trotter, who was headed up the stairs. After Navarre was in the woods, he heard another gunshot. Then Trotter came running up behind Navarre.

After returning the car to his wife, Nash had changed into his work uniform and driven his ADT company van

back to the area where he had been parked for the robbery. Shortly after Nash arrived, he observed Eddington, Trotter, and Navarre running towards him. After the three jumped into Nash's ADT van, Nash drove away.

Once inside the van, Trotter mumbled, "Look what you made me do. He should have just laid down. All he had to do was just lay down. I wouldn't have had to kill him. He wouldn't have to get killed."

James followed them in the gold Saturn. When they arrived at Nash's house, Eddington counted $4,000 as the spoils from the robbery. The five divided it equally, each taking $800. Nash then disposed of the clothes and the weapons.

Damante Huff, Wallace's and Huff's 8 year-old son, informed the police that he awoke to noises in the house. He heard his mom say, "I'm pregnant. I swear to God it's in there." Damante got up from his bed and looked out of his bedroom door. A man in the hallway with his mother pushed him back into his room. Damante returned to his bed, but he could see another man who appeared to be fighting with his father on the stairs. Damante heard his father say, "Chris." Then, Damante heard gunshots.

Damante stayed in his bed until everything was quiet. Damante, followed by his 7 year-old sister, Ebony, went to his parents' room. Damante asked his mother where his father was. Huff did not respond. Huff had been killed by a point-blank gunshot in the back of her head. Janae was awake and shaking next to her mother's body. Damante picked Janae up and ran out of the house with his two sisters. As Damante ran out of the garage, Damante observed his father slumped over the neighbor's car. Wallace was dead. He had been beaten, then shot twice, once in the face and once in the back of the head. Damante and his sisters ran to a nearby friend's house. His friend's mother called the police.

During the investigation, Damante told police that his father's friend Chris did it. Police then asked

Wallace's mother, Marva Wallace, who her son knew named Chris. Marva informed the officers that her son knew a Chris Trotter. Wallace had gone to high school with a Trotter in Leavenworth. Officers soon connected Trotter with Nash, Eddington, Navarre, and James.

Nash, Eddington, and Navarre entered into plea agreements, with each of them agreeing to plead guilty to one count of aggravated robbery and one count of conspiracy to commit aggravated robbery. In addition, they each agreed that the sentences for those crimes would be run consecutively. Pursuant to the agreements, Nash was sentenced to a total of 95 months in prison, Eddington was sentenced to 111 months in prison, and Navarre was sentenced to 95 months in prison. As part of the plea agreements, Nash, Eddington, and Navarre agreed to testify against any and all codefendants. In exchange for their pleas, the State agreed to drop the murder charges, preventing Nash, Eddington, and Navarre from facing the possibility of life in prison or the death penalty.

Trotter was charged with first-degree premeditated murder for killing Wallace, capital murder for killing Huff, aggravated robbery, and conspiracy to commit aggravated robbery. The State sought the death penalty for the capital-murder charge. At trial, Nash, Eddington, and Navarre testified against Trotter and identified him as the shooter. The only physical evidence linking Trotter to the crimes was his fingerprints on the batteries in a flashlight found in the grass behind Wallace and Huff's duplex. A jury convicted Trotter of all charges but refused to impose the death penalty. *State v. Trotter*, 127 P.3d 972, 974-76 (Kan. 2006).

Petitioner filed a direct appeal, alleging the trial court erred in failing to instruct on eyewitness identification, the trial court erred in admitting evidence that one of the victims was pregnant at the time of the murders, the prosecution used

peremptory challenges to impermissibly remove African-American jurors from the venire panel, and the evidence was insufficient to support the convictions of capital murder and first-degree premeditated murder.

The Kansas Supreme Court affirmed the convictions. *State v. Trotter*, 127 P.3d 972 (Kan. 2006). Petitioner then filed a motion for state post-conviction relief pursuant to K.S.A. 60-1507 alleging he received ineffective assistance of counsel and that newly-discovered evidence involving recanted testimony warranted relief. The district court summarily denied the motion. Thereafter, the Kansas Supreme Court affirmed in part and reversed in part, finding the petitioner's convictions of capital murder and first-degree premeditated murder were multiplicitous and required the reversal of the conviction of first-degree premeditated murder. *Trotter v. State*, 200 P.3d 1236 (Kan. 2009).

Petitioner then commenced the present petition for habeas corpus relief. Petitioner presents eight claims for relief, namely: (1) the trial court erred in failing to instruct the jury on assessing eyewitness testimony; (2) the trial court erred in admitting evidence that Ms. Huff was pregnant at the time of her death; (3) the prosecution's use of peremptory strikes violated *Batson v. Kentucky*, 476 U.S. 79 (1986); (4) the

trial court erred in summarily denying petitioner's application for post-conviction relief; (5) petitioner's appellate counsel was ineffective in failing to claim the criminal complaint was defective; (6) appellate counsel was ineffective in failing to challenge the decision barring testimony of the co-defendants' prior robbery of Mr. Wallace; (7) the trial court erred in not instructing the jury on multiple acts; and (8) appellate counsel was ineffective for failing to raise the multiple acts jury instruction on appeal.

## Discussion

### Motion for the appointment of counsel

Petitioner has filed a motion seeking the appointment of counsel (Doc. 3). There is no constitutional right to the appointment of counsel in a federal habeas corpus action. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Rather, the decision whether to appoint counsel rests in the discretion of the court. *Swazo v. Wyoming Dep't. of Corrections State Penitentiary Warden*, 23 F.3d 332, 333 (10th Cir. 1994). *See also* 18 U.S.C. § 3006A(a)(2)(B)(the court may appoint counsel in action under § 2254 where "the interests of justice so require").

In deciding whether to appoint counsel in a civil action, the court should consider "the litigant's claims, the nature of

the factual issues raised in the claims, the litigant's ability to present his claims, and the complexity of the legal issues raised by the claims." *Long v. Shillinger*, 927 F.2d 525, 526-27 (10th Cir. 1991).

The court has examined the record and finds the petitioner's claims were developed in the state courts with the assistance of counsel, that petitioner is able to clearly identify the claims he wishes to pursue and the legal basis for them, and that the issues presented in this matter are not unusually complicated. The court further finds no hearing is necessary in this matter. In light of these circumstances, the court concludes the appointment of counsel is not warranted.

**The standard of review**

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs review of the grounds for relief presented by petitioner and adjudicated on the merits in the state courts. *See Turrentine v. Mullin,* 390 F.3d 1181, 1188 (10th Cir. 2004). Under the AEDPA, this court may grant relief only if the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

In applying the AEDPA, the court must determine whether the

principle of federal law on which the petitioner's claim is based was clearly established by the Supreme Court at the time of the state court judgment. *Turrentine,* 390 F.3d at 1189. If so, the court considers whether the state court decision was contrary to, or an unreasonable application of, clearly established federal law. *Id.*

A decision is "contrary to" clearly established federal law 2254 if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from" the result reached by the Supreme Court. *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000). This standard is deferential and allows relief only where the decision of the state court is "diametrically different" and "mutually opposed" to the Supreme Court decision itself. *Id.* at 406. A state court decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

The factual findings of the state courts are presumed to be correct, and the petitioner has the burden of rebutting the

presumption by clear and convincing evidence. *See Short v. Sirmons*, 472 F.3d 1177, 1184 (10th Cir. 2006)*(citing* 28 U.S.C. § 2254(e)(1)).

## 1. Jury instruction on eye-witness identification

Petitioner first contends the trial court erred in failing to give the jury a cautionary instruction on evaluating testimony concerning eye-witness identification. This assignment of error was directed to testimony of the victims' eight year old son Damante. Damante was unable to identify petitioner's photo the day following the murders and instead identified the photo as his father's friend Rock, the husband of petitioner's sister. However, three months later, Damante identified petitioner's photo when he was shown photos of all five of the co-defendants charged in the murders.

The Kansas Supreme Court first found that petitioner's counsel did not request a jury instruction on eyewitness identification but instead requested an instruction on witness credibility. The court applied a standard of review that jury instructions are clearly erroneous only if the court is convinced that there is a real possibility that the jury would have reached a different result if the trial error had not occurred. *State v. Batson*, 127 P.3d at 978-79.

Under Kansas case law, an instruction on eyewitness

identification is not required where the witness is familiar with the person identified. In such circumstances, cross-examination is sufficient to challenge the reliability of the identification. *Id*. at 979 (citing cases).

Here, Damante was acquainted with the petitioner because the petitioner and victims were friends and the petitioner had been in the victims' home. The Kansas Supreme Court found the cross-examination of Damante was thorough, and it concluded petitioner had failed to establish any real possibility that the jury would have reached a different decision had it been instructed on eyewitness identification. *Id*. at 979.

A petitioner seeking habeas corpus relief based on erroneous jury instructions "bears a heavy burden of proof." *Shafer v. Stratton,* 906 F.2d 506, 508 (10th Cir. 1990). In habeas corpus, a challenge to jury instructions "may not be used to set aside a state conviction ... unless the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial in the constitutional sense," *Shafer,* 906 F.2d at 508 (quotation omitted), or "so infected the entire trial that the resulting conviction violates due process," *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)(quoting *Cupp v. Naughten,* 414 U.S. 141, 147 (1973)).

The Kansas Supreme Court thoroughly evaluated the testimony

given by Damante and the cross-examination of that testimony. It noted that the prosecution did not, in fact, ask Damante to identify the petitioner in direct examination. Rather, Damante testified that he heard his father say "Chris" during the incident. During cross-examination, the defense elicited testimony that the person Damante knew as "Chris" was the person who pushed him into his room. Then, on redirect examination, Damante identified the petitioner as Chris and testified he was at the house on the night of the murders. On re-cross examination, defense counsel again elicited testimony from Damante that the person who pushed him was Chris. This testimony was contradictory to the testimony of a co-defendant, a fact defense counsel argued to the jury.

The Kansas Supreme Court reached a decision that is consistent with the governing standards, and petitioner has not sustained the heavy burden he bears to entitled to relief on this challenge to the jury instructions.

## 2. Admission of evidence that Ms. Huff was pregnant

Petitioner next asserts that the trial court erred in allowing testimony that Ms. Huff was pregnant when she was murdered.

The Kansas Supreme Court found that the testimony concerning Ms. Huff's pregnancy was relevant because it

corroborated the testimony of Damante and co-defendants Navarre and Eddington concerning statements made by Huff during the incident and bolstered the veracity of their testimony. *State v. Trotter*, 127 P.3d at 980. The Kansas Supreme Court also noted that, while some potential jurors acknowledged they might be prejudiced by Ms. Huff's pregnancy, none of those individuals served on the jury, nor did the jury impose the death sentence sought by the prosecution. *Id*. at 980-81.

"As a general matter, federal habeas corpus relief does not lie to review state law questions about the admissibility of evidence ..." *Moore v. Marr,* 254 F.3d 1235, 1246 (10th Cir. 2001). Rather, where, as here, no particular constitutional guarantee is implicated, a state court's evidentiary ruling warrants habeas corpus relief only if the alleged error was "so grossly prejudicial [that it] fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Revila v. Gibson*, 283 F.3d 1203, 1212 (10th Cir. 2002)(citation omitted).

The court agrees that petitioner has not made the necessary showing of prejudice. The evidence of Ms. Huff's statements that were reflected in testimony and the testimony of a witness concerning his observation of her were relevant and supported the version of events presented by the prosecution. There is no

showing the jury was unduly influenced by that information, and petitioner is not entitled to relief on this claim.

## 3. Use of peremptory challenges to exclude potential jurors

Petitioner asserts the prosecution improperly used peremptory challenges to remove African-American members from the jury pool. He contends the prosecution used peremptory challenges to remove nine of the ten members from the jury pool on the basis of race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

A challenge under *Batson* is evaluated under a three-part analysis. First, the defendant must make a prima facie showing "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California,* 545 U.S. 162 (2005)(quoting *Batson,* 476 U .S. at 93-94). When that showing is met, the burden shifts to the State to present a race-neutral basis for the strike. *Id.* Finally, when a race-neutral basis is advanced, the trial court must determine whether the defendant has proved purposeful racial discrimination. *Id*.

Under Tenth Circuit case law, " '[t]he disposition of a *Batson* claim is a question of fact subjected to the standard enunciated in 28 U.S.C. § 2254(d)(2).'" *Saiz v. Ortiz,* 392 F.3d 1166, 1175 (10th Cir. 2004) (quoting *Sallahdin v. Gibson,* 275

F.3d 1211, 1225 (10th Cir. 2002)).

The Kansas Supreme Court applied the correct legal standard established in *Batson* and carefully analyzed the prosecution's peremptory strikes. Its discussion identifies the basis for the prosecution's challenge to each juror[1], and this court, having carefully reviewed its analysis, concludes the application of established federal law to the record was entirely reasonable. The basis for each peremptory strike is clearly established in the record, and the decisions of the trial and appellate courts

---

[1] The bases for the challenged peremptory strikes may be summarized as follows:

B.E. and R.H. each stated she could not impose the death penalty;

G.L. stated her sibling had been convicted of murder in Wyandotte County and she did not believe the criminal justice system treated him fairly;

D.C. stated he could not impose the death penalty and later stated he was "mixed up" about the penalty;

C.M. had been in counseling for anger management, stated he blamed the police for the terrorist attacks of September 11, 2001, stated that he did not believe in the death penalty, and stated that he believed the death penalty was appropriate only in cases involving torture or children;

R.C. was a pastor, and the prosecutor stated he found that clergy members "tend to be forgiving" (Voir dire trans. p. 999);

J.C. was active in a prison ministry, may have been unable to impose the death penalty, and believed that minorities are death-sentenced more often than others;

C.P. wore sunglasses throughout voir dire, suggesting a lack of respect for the court; his son had been convicted of shooting a police officer; and he stated he would hold the state to a standard higher than beyond a reasonable doubt; and

B.E., R.H., G.L.: Petitioner made no specific claims regarding the strikes of these individuals. *State v. Trotter*, 127 P.3d at 982-85.

are well-supported.  Petitioner is not entitled to relief on this claim.

**4. Summary denial of petitioner's action under K.S.A. 60-1507**

Petitioner next alleges error in the state district court's summary denial of his post-conviction action.

State post-conviction proceedings are matters of state law that are not cognizable in habeas corpus.  *Steele v. Young*, 11 F.3d 1518, 1524 (10th Cir. 1993); *Hopkinson v. Shillinger*, 866 F.2d 1185, 1218-19, *reh'g granted on other grounds*, 888 F.2d 1286 (10th Cir. 1989), *cert. denied*, 497 U.S. 1010 (1990).  Thus, this allegation of error will not support habeas corpus relief.

**5, 6, 7, and 8. Procedurally defaulted claims of ineffective assistance of appellate counsel and failure to instruct on multiple illegal acts**

The petition asserts three claims of ineffective assistance by petitioner's appellate counsel, namely: counsel erred in failing to challenge the complaint as defective (Ground 5), erred in failing to challenge the decision of the trial court to exclude evidence that petitioner's co-defendants had robbed the victim previously (Ground 6), and erred in failing to challenge the trial court's failure to give the jury an instruction on multiple acts (Ground 8).  In addition, the petition asserts error in the failure of the trial court to instruct the jury on

multiple acts (Ground 7).

Respondent argues these grounds were procedurally defaulted due to petitioner's failure to present them to the state courts. Petitioner concedes this, noting on the petition that he failed to present these claims because he proceeded pro se in his initial application under K.S.A. 60-1507. (Doc. 1, pp. 14-20.) He seeks a stay and abeyance to present these claims to the state courts.

A habeas court considering a petition that includes both exhausted and unexhausted claims has discretion to enter a stay to permit the petitioner to return to the state courts. *See Rhines v. Weber*, 544 U.S. 269, 276 (2005). Such a stay and abeyance is appropriate "when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Rhines*, 544 U.S. at 276-78 (noting such a stay should not be granted if the unexhausted claims are plainly without merit or if the petitioner has intentionally delayed seeking review or otherwise has engaged in abusive tactics).

While the *Rhines* decision does not define "good cause" for this inquiry, the court concludes petitioner cannot satisfy the requisite showing. First, the failure to present the claims was not caused by an objective factor external to the petitioner.

"[T]he majority of th[e] lower courts which have addressed the issue at length analogized the 'good cause' requirement to the requirement that a habeas corpus petitioner demonstrate 'cause' to excuse other types of procedural defaults." *Ramdeo v. Phillips*, 2006 WL 297462, *5 (E.D.N.Y. Feb. 8, 2006)(citations omitted). "Even in cases which expressly reject the notion that 'good cause' is analogous to 'cause' for a procedural default ..., the 'good cause' has arisen from external factors, not petitioner's own decisions." *Ramdeo,* 2006 WL 297462, *6 (citation omitted). *Accord Mills v. Hudson*, 2009 WL 484181, *7 (N.D. Ohio 2009)(neither pro se status nor lack of legal knowledge sufficient to support stay and abeyance).

Next, the claims petitioner advances do not appear to be potentially meritorious in light of the record in this case.

Finally, it does not appear that any state court remedy remains available. *See* K.S.A. 60-1507(c)("The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner.") Accordingly, the court must reject petitioner's request for a stay and abeyance.

Respondent seeks the dismissal of the unexhausted claims on the grounds of procedural default. The requirement of exhaustion in habeas corpus is well established. Simply stated, the

"substance of a federal habeas corpus claim" must have been presented to the state courts before it may be presented to the federal habeas court. *Picard v. Connor*, 404 U.S. 270, 278 (1971). A petitioner proceeding under § 2254 must demonstrate the use of all available state remedies. *See Miranda v. Cooper,* 967 F.2d 392, 398 (10th Cir. 1992).

Where a habeas claim has not been presented in the state courts, the federal court generally will not consider that claim "unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *Cummings v. Sirmons,* 506 F.3d 1211, 1224 (10th Cir. 2007)(citation omitted).

While ineffective assistance of counsel can establish "cause" to excuse procedural default in some circumstances, *see Murray v. Carrier,* 477 U.S. 478, 488-89 (1986), the instance of ineffective assistance must be sufficiently grave to cause a constitutional violation. *Id*. Finally, the ineffective assistance claim must be presented to the state courts as an independent claim before it may be used to establish cause to excuse a procedural default. *Id.* at 489.

Petitioner did not present to the state courts a claim of ineffective assistance of trial or appellate counsel related to the defaulted claims. Therefore, any alleged ineffective assistance of counsel cannot be considered as "cause" to excuse

19

the procedural default.

In addition, to establish prejudice, the petitioner must show actual prejudice as a result of the alleged violation of federal law. *Coleman v. Thompson,* 501 U.S. 722, 724 (1991). Petitioner has not shown such prejudice.

Finally, to excuse a procedural default by showing a fundamental miscarriage of justice will occur unless the court considers a defaulted claim, a petitioner must show a probability of actual innocence. This test provides an "extremely narrow exception, implicated only in an extraordinary case, 'where a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Phillips v. Ferguson,* 182 F.3d 769, 774 (10th Cir. 1999)(quoting *Ballinger v. Kerby,* 3 F.3d 1371, 1375 (10th Cir. 1993)(quoting *Murray,* 477 U.S. at 496)). Petitioner has made no such showing.

Because the petitioner has not satisfied the standards of cause and prejudice or of a fundamental miscarriage of justice, the court does not reach the merits of the defaulted claims.

### Conclusion

For the reasons set forth, the court concludes petitioner is not entitled to relief in this action. The state courts' analysis of petitioner's claims concerning an instruction on witness credibility, on the admission of evidence that Ms. Huff

was pregnant, and on the use of peremptory challenges is well-supported and consistent with federal law. Petitioner's claim concerning the summary dismissal of his state post-conviction action in the state district court does not present a federal claim. The remainder of petitioner's claims were procedurally defaulted and do not entitle him to relief.

IT IS, THEREFORE, BY THE COURT ORDERED the petition for habeas corpus is dismissed and all relief is denied.

IT IS FURTHER ORDERED petitioner's motion for the appointment of counsel (Doc. 3) is denied.

Copies of this Memorandum and Order shall be transmitted to the parties.

**IT IS SO ORDERED**.

Dated at Wichita, Kansas, this 2d day of March, 2010.


S/ Wesley E. Brown
WESLEY E. BROWN
United States Senior District Judge